**ASSET PURCHASE AGREEMENT**

**by and between**

**The Lester Group, Inc.,**
**("Purchaser"),**

**and**

**Taylor Brothers, Incorporated**
**("Seller")**


**January 12, 2010**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") as of January 12, 2010, by and among The Lester Group, Inc., a Virginia corporation, and/or assigns (the "Purchaser"), and Taylor Brothers, Incorporated, a Virginia corporation (the "Seller").  The Seller and the Purchaser may be referred to herein individually as a "Party" and together as the "Parties."

The Seller has been engaged in the business of the sale of building materials (the "Business").  The Seller desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, the Purchased Assets (as hereinafter defined) in accordance with the terms and provisions of this Agreement.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions.    For the purposes of this Agreement and the Ancillary Agreements:

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person.  For purposes of this Agreement, in the case of a specified Person that is an individual, the term "Affiliate" also includes (a) the individual's spouse, (b) the members of the immediate family (including parents, siblings and children) of the individual or of the individual's spouse and (c) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with any of the foregoing individuals.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" means, collectively, the Exhibits and the Bill of Sale and any other agreements and documents necessary to consummate the transaction contemplated herein.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"Code" means the Internal Revenue Code of 1986.

"Confidential Information" means the proprietary and confidential data or information of the Seller concerning the Business, which is of tangible or intangible value to the Business and is not generally known by or available to the competitors of the Business, except data or information that (a) is or becomes known or available to the public; or (b) is or becomes known

to any of the Purchaser's employees, officers, shareholders or directors or their respective employees, officers, shareholders or directors through sources having no duty of confidentiality with respect thereto.

"Consent" means any approval, consent, ratification, waiver or other authorization.

"Contract" means any contract, agreement, lease (including, but not limited to, the Lease), license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond, option, warrant or other instrument or consensual obligation, whether written or oral.

"Environmental Law" means any Law relating to the environment, natural resources, pollutants, contaminants, wastes, chemicals or public health and safety, including any Law pertaining to (a) treatment, storage, disposal, generation and transportation of toxic or hazardous substances or solid or hazardous waste, (b) air, water and noise pollution, (c) groundwater or soil contamination, (d) the release or threatened release into the environment of toxic or hazardous substances or solid or hazardous waste, including emissions, discharges, injections, spills, escapes or dumping of pollutants, contaminants or chemicals, (e) manufacture, processing, use, distribution, treatment, storage, disposal, transportation or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or oil or petroleum products or solid or hazardous waste, (f) underground and other storage tanks or vessels, abandoned, disposed or discarded barrels, containers and other closed receptacles, (g) public health and safety or (h) the protection of wild life, marine sanctuaries and wetlands, including all endangered and threatened species.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any other Person that, together with the Seller, would be treated as a single employer under Section 414 of the Code.

"GAAP" means generally accepted accounting principles for financial reporting in the United States, as in effect as of the date of this Agreement.

"Governmental Authority" means any (a) federal, state, local, municipal, foreign or other government, (b) department, agency or instrumentality of a foreign or other government, including any state-owned or state controlled instrumentality of a foreign or other government, (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal) or (d) Public International Organization or multinational organization.

"Governmental Authorization" means any Consent, license, franchise, permit or registration issued, granted or given by or under the authority of any Governmental Authority or pursuant to any Law.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as, or otherwise determined to be, hazardous, radioactive or toxic or a pollutant or a contaminant under any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor,

asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Indebtedness" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money, including all interest and prepayment penalties payable thereon, (b) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments or debt securities and warrants or other rights to acquire any such instruments or securities and (c) all Indebtedness of others guaranteed, directly or indirectly, in any manner by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to pay for property or services irrespective of whether such property is received or such services are rendered, (iii) to grant an encumbrance on property owned or acquired by such Person, whether or not the obligation secured thereby has been assumed, or (iv) otherwise to assure a creditor against loss.

"IRS" means the Internal Revenue Service and, to the extent relevant, the Department of Treasury.

"Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Law" means any federal, state, local, municipal, foreign, international or multinational, constitution, law, statute, treaty, rule, regulation, ordinance, code, binding case law or principle of common law.

"Lease" means the lease for 905 Graves Mill Road, Lynchburg, Virginia, by and between the Seller, as tenant, and Taylor Family Holdings, L.L.C., as landlord.

"Liability" includes liabilities, debts or other obligations of any nature, whether known or unknown, absolute, accrued, contingent, liquidated, unliquidated or otherwise, secured or unsecured, guaranteed or unguaranteed, due or to become due or otherwise, and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP.

"Loss" means any loss, Proceeding, Judgment, damage, fine, penalty, expense (including, but not limited to, all fees and costs of attorneys, experts and consultants in all tribunals and whether or not any Proceeding is commenced), Liability, Tax or encumbrance.

"Occupational Safety and Health Law" means any Law designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"Permitted Encumbrances" means statutory liens for current or personal property Taxes, which are not yet due and payable.

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, formal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Seller Representatives" means John Kauzlarich and Phillip R. Roper, III.

"Subsidiaries" means, with respect to a specified Person, any corporation or other Person controlled by the specified person or one or more of its Subsidiaries.  When used in this Agreement without reference to a particular Person, "Subsidiary" means a Subsidiary of the Seller.

"Tax" means (a) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including taxes under Section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority, (b) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute and (c) any items described in this paragraph that are attributable to another Person but that the Seller is required to pay by Law, by Contract or otherwise.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Treasury Regulations" means the federal income Tax regulations promulgated under the Code, including temporary regulations, as such regulations may be amended from time to time. All references in this Agreement to specific sections of the treasury regulations will be deemed also to refer to any corresponding provisions of succeeding treasury regulations, and any references to temporary regulations will be deemed also to refer to any corresponding provisions of final treasury regulations.

"Wells Fargo Lien" means the secured lien of Wells Fargo Bank, N.A., which is secured, in part, by the Purchased Assets and the Lease.

Additional Defined Terms.    For purposes of this Agreement and the Ancillary Agreements, the terms have the meanings specified in this Agreement:

Section 1.2    Construction.  Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise.  The headings of Articles and Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  All words used in this Agreement are to be construed to be of such gender or number as the circumstances require.  The words "including," "includes," or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.  Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement.  Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time.  Any reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date.  Any reference to "the ordinary course of business" is to be read as "the ordinary course of business, consistent with past practice".

## ARTICLE 2
## THE TRANSACTION

Section 2.1    Purchase and Sale of Purchased Assets.  In accordance with the provisions of this Agreement, at the Closing, the Seller will sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, free and clear of all liens and encumbrances other than Permitted Encumbrances, all right, title and interest of the Seller in and to the following assets of the Seller (collectively, the "Purchased Assets"):

(a)    all inventory held by Seller for re-sale located at 905 Graves Mill Road, Lynchburg, Virginia (the "Inventory");

(b)    all those assets described in Exhibit 2.1(b) (the "Fixed Assets"), which by this reference is made a part of this Agreement; and

(c)    all rights, title and interests of the Seller in and to the names and marks "Taylor Bros. Lumber Co.", "Taylor Brothers", "Taylor Brothers Lumber", "Taylor Brothers, Incorporated" and all variations of the foregoing, including, but not limited to, all logos, Internet addresses, domain names, trademarks, service marks, registrations and applications in any manner whatsoever related or applicable thereto (including any intent to use applications, supplemental registrations and any renewals or extensions), any other indicia of commercial source or origin, all business and marketing plans, advertising and promotional materials and all goodwill association with any of the foregoing (collectively, the "Intellectual Property").

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement does not include the assumption of any Liability related to the Purchased Assets unless the Purchaser expressly assumes that Liability in this Agreement.

Section 2.2    Assumed Liabilities.  There are no assumed Liabilities.

Section 2.3    Liabilities.  Notwithstanding any other provision of this Agreement or any other writing to the contrary, and regardless of any information disclosed to the Purchaser, the Purchaser does not assume and has no responsibility for any Liabilities whatsoever of the Seller.

Section 2.4    Consideration.  The consideration for the Purchased Assets shall be the sum of (a) sixty percent (60%) of the Seller's cost for all the inventory described in Exhibit 2.1(a), which by this reference is made a part of this Agreement, (b) the Seller's net book value of the Fixed Assets (as set forth in Exhibit 2.1(b) incorporating Schedule 2.1(b)) and (c) One Thousand Dollars ($1,000.00) for the Intellectual Property (collectively, the "Purchase Price"), subject to prorations for any personal property Taxes assessed against the Purchased Assets, which are not yet due and owing as of the date of the Closing.  Within two (2) business days after the Purchaser receives a fully executed copy of this Agreement without any modifications not agreed to by the Purchaser, the Purchaser shall provide the Seller's attorney, Durrette Bradshaw, PLC (the "Escrow Agent") with a deposit of Fifty Thousand ($50,000.00) by check or wire transfer of immediately available funds (together with accrued interest thereon, the "Deposit").  The Escrow Agent shall place the Deposit into escrow in an interest-bearing account at a federal banking institution satisfactory to the Purchaser pending the Closing (as hereinafter defined) contemplated herein or shall otherwise disburse the Deposit in accordance with the terms and provisions of this Agreement.  At the Closing, the Escrow Agent shall pay the Deposit to the Seller and the Deposit shall be applied to the Purchase Price.

Section 2.5    Closing.  Subject to the entry of an order by the Bankruptcy Court as contemplated by Section 5.3(b), the closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Troutman Sanders LLP, 1001 Haxall Point, Richmond, VA 23219, at 10:00 a.m., local time, on January 22, 2010, or, if all of the conditions set forth in Section 6.1 and Section 5.3(b) have not been satisfied or waived on such date, on such later date as soon as practicable, but in no event later February 5, 2010, or at such other time and place as the Purchaser and the Seller may agree in writing.  Should Closing fail to occur on January 22, 2010 due solely to the breach by the Purchaser of its obligations under this Agreement, the foregoing February 5, 2010 deadline shall not be applicable.  Notwithstanding any provision in this Agreement to the contrary, the Purchaser may, in its sole discretion, terminate this Agreement without any liability or penalty of the Purchaser whatsoever if the Closing shall not have occurred on or prior to February 5, 2010 for any reason other than the Purchaser's default under this Agreement, and upon such termination, the Escrow Agent shall pay the Deposit to the Purchaser.  The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.6    Closing Deliveries.

(a)    At the Closing, the Seller will deliver or cause to be delivered to the Purchaser:

(i)    a bill of sale in form and substance satisfactory to the Purchaser, (the "Bill of Sale") executed by the Seller;

(ii)    a certificate in form and substance satisfactory to the Purchaser, dated as of the Closing Date, executed by an authorized officer of the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b);

(iii)    a certification in form and substance satisfactory to the Purchaser, executed by the Seller stating, under penalty of perjury, that the Seller's U.S. employer identification number and address and that the Seller is not a "foreign person" as defined in Section 1445 of the Code;

(iv)    a copy of the Bankruptcy Court Approvals, as defined in Section 5.3(b) hereof, which shall include language pursuant to 11 U.S.C. Section 363 providing for sale of the Purchased Assets free and clear of any liens, claims or encumbrances and for the rejection of the Lease;

(v)    a certificate in form and substance satisfactory to the Purchaser from the secretary or assistant secretary of the Seller dated as of the Closing Date and attaching with respect to the Seller (A) the Seller's articles of incorporation and all amendments thereto, certified by the Secretary of the State Corporation Commission of Virginia (the "SCC") not more than ten (10) business days prior to the Closing Date; (B) a certificate of good standing of the Seller certified by the Secretary of the SCC issued not more than ten (10) business days prior to the Closing Date; (C) all resolutions of the governing body of the Seller required in order to authorize to this Agreement and the transaction contemplated by this Agreement; and (D) incumbency and signatures of the officers of the Seller executing this Agreement or any other agreement contemplated by this Agreement;

(vi)    a receipt for the Purchase Price in form reasonably satisfactory to the Purchaser; and

(vii)    such other documents, instruments and agreements as the Purchaser reasonably requests for the purpose of consummating the transaction contemplated by this Agreement.

At the Closing, the Seller shall, at its sole cost and expense, file or cause to be filed the documents and instruments described in Section 2.6(a)(vii) hereof.

(b)    At the Closing, the Purchaser will deliver or cause to be delivered to the Seller:

(i)    the Purchase Price, less the Deposit, by attorney escrow check or wire transfer of immediately available funds;

(ii)    a certificate in form and substance satisfactory to the Seller, dated as of the Closing Date, executed by an officer of the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b); and

(iii)    such other documents, instruments and agreements as the Seller reasonably requests for the purpose of consummating the transaction contemplated by this Agreement.

# ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Purchaser that as of the date of this Agreement and as of the Closing Date the statements set forth in this Article 3 are true and correct in all material respects:

Section 3.1     Organization and Good Standing.  The Seller is duly organized, validly existing and in good standing under the Laws of the Commonwealth of Virginia and has all requisite power and authority to own, lease and operate its properties and assets and to conduct its businesses (including, but not limited to, the Business) as presently conducted by it.  The Seller is duly qualified or licensed to do business.  The Seller is not in default under or in violation of any provision of its Articles of Incorporation or By-Laws.

Section 3.2     Authority and Enforceability.  Subject to obtaining the Bankruptcy Court Approvals, the Seller hereby represents and warrants that:

(a)     The Seller has all requisite power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.  The execution, delivery and performance of this Agreement and the consummation of the transaction contemplated by this Agreement have been duly authorized by all necessary action on the part of the Seller.  The Seller has duly and validly executed and delivered this Agreement.  This Agreement constitutes the valid and binding obligations of the Seller, enforceable against the Seller in accordance with its terms.

(b)     The Seller has all requisite corporate power and authority to execute and deliver each Ancillary Agreement to which the Seller is a Party and to perform its obligations under each such Ancillary Agreement.  The execution, delivery and performance of each such Ancillary Agreement and the consummation of the transactions contemplated thereby and by this Agreement have been duly authorized by all necessary action on the part of the Seller.  On or prior to the Closing, the Seller will have duly and validly executed and delivered each Ancillary Agreement to which it is a Party.  Upon execution and delivery, each Ancillary Agreement will constitute the valid and binding obligations of the Seller, enforceable against the Seller in accordance with its terms.

Section 3.3     No Conflict.  Neither the execution, delivery and performance by the Seller of this Agreement and each Ancillary Agreement to which it is a Party, nor the consummation by the Seller of the transactions contemplated hereby or thereby, will (a) directly or indirectly (with or without notice, lapse of time or both) conflict with, result in a breach or violation of, constitute a default under, give rise to any right of revocation, withdrawal, suspension, acceleration, cancellation, termination, modification, imposition of additional obligations or loss of rights under, result in any payment becoming due under, or result in the imposition of any liens or encumbrances on any of the Purchased Assets or the Lease, or otherwise give rise to any right on the part of any Person to exercise any remedy or obtain any relief under (i) the applicable charter or organizational documents of the Seller or any resolution adopted by the governing body of the Seller, (ii) any Contract to which the Seller is a party, by which the Seller or any of its properties or assets (including the Purchased Assets and the Lease)

is bound or affected or subject or pursuant to which the Seller is an obligor or a beneficiary or (iii) any Law, Judgment or Governmental Authorization applicable to the Seller or its businesses, properties or assets (including, but not limited to, the Business and the Purchased Assets); or (b) except for the the Bankruptcy Court Approvals, require the Seller to obtain any other Consent or Governmental Authorization of, give any notice to, or make any filing or registration with, any Governmental Authority or other Person.

Section 3.4    Title to Assets.  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all liens and encumbrances and rights of others thereto other than the Wells Fargo Lien.

Section 3.5    Sale As Is, Where Is.  Except as set forth in this Article 3 and in Sections 2.1, 5.2, 5.4(a), 5.5 and 9.1, and except as set forth in the documents to be delivered by the Seller pursuant to Section 2.6, the Seller makes no representations or warranties with respect to the Purchased Assets, and the Purchased Assets are being sold to Purchaser in their "as is" condition on December 27, 2009, normal wear and tear excepted.

Section 3.6    Environmental, Health and Safety Matters.

(a)    To the best of the Seller's and the Seller Representatives' knowledge and belief, the Seller is, and at all times has been, in compliance in all respects with all Environmental Laws and Occupational Safety and Health Laws applicable to the Purchased Assets.  Without limiting the generality of the foregoing, the Seller has obtained and complied in all respects with all Governmental Authorizations that are required pursuant to Environmental Laws and Occupational Safety and Health Laws in connection with the Purchased Assets, and the Seller is, and at all times has not been subject to any Liability under any Environmental Laws or Occupational Safety and Health Laws.

(b)    The Seller has not received any notice, report or other communication or information regarding (i) any actual, alleged or potential violation of, or failure to comply with, any Environmental Law or Occupational Safety and Health Law or (ii) any Liability or potential Liability, including any investigatory, remedial or corrective obligation, relating to the Seller or any Purchased Asset.

(c)    Except for fluids and other materials necessary for the ordinary operation and maintenance of the Purchased Assets, to the best of Seller's Representatives knowledge, information and belief, none of the Purchased Assets contains any Hazardous Material; and with respect to such fluids or other materials necessary for the ordinary operation and maintenance of the Purchased Assets, to the best of Seller's Representatives knowledge, information and belief the Seller has stored, used, disposed of, handled and treated such fluids and other materials in full compliance with all Environmental Laws and Occupational Safety and Health Laws.

(d)    No event has occurred or circumstance exists relating to any of the Purchased Assets that could reasonably be expected to (i) prevent, hinder or limit continued compliance in all respects with any Environmental Law or Occupational Safety and Health Law, (ii) give rise to any investigatory, remedial or corrective obligations pursuant to any Environmental Law or Occupational Safety and Health Law or (iii) give rise to any other Liability pursuant to any

Environmental Law or Occupational Safety and Health Law, including any Liability relating to onsite or offsite releases of, or exposure to, Hazardous Materials, personal injury, property damage or natural resources damage.

(e)     Neither this Agreement, nor the consummation of the transaction contemplated by this Agreement, will result in any obligation for site investigation or cleanup, or Consent or Governmental Authorization of, notice to, or filing or registration with, any Governmental Authority or other Person, pursuant to any of the so-called "transaction-triggered" or "responsible property transfer" Environmental Laws.

Section 3.7     Compliance with Laws, Judgments and Governmental Authorizations.

(a)     Without limiting the scope of any other representation in this Agreement, the Seller is in compliance and has complied in all respects with all, and the Seller has not violated in any respect, any Laws, Judgments or Governmental Authorizations applicable to it or to the ownership or use of any Purchased Asset.  No event has occurred or exists that (with or without notice, lapse of time or both) would reasonably be expected to result in a violation by the Seller of, or failure on the part of the Seller to comply with, any applicable Law, Judgment or Governmental Authorization, or a revocation, withdrawal, suspension, cancellation, termination or modification of any applicable Governmental Authorization, or that would reasonably be expected to give rise to any obligation on the part of the Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature in connection with the ownership or use of any Purchased Asset or relating to any Purchased Asset.

(b)     The Seller, in accordance with the provisions of Virginia Code Section 58.1-629, will have prepared and filed as of Closing with the Virginia Department of Taxation a final sales and use tax return for all periods to and including December 31, 2009 and will have paid all Virginia sales and use Taxes, penalties and interest to be paid by Seller in or for such periods.

Section 3.8     Legal Proceedings.  Except for the Seller's pending chapter 11 case described in Section 5.3(b) (Case No. 10-30216) in the Bankruptcy Court, there is no Proceeding pending or, to the knowledge of the Seller or the Sellers' Representatives, threatened, against the Seller that challenges, or that would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, the transaction contemplated by this Agreement.

Section 3.9     Brokers or Finders.  Neither the Seller nor any Person acting on behalf of the Seller, has incurred any Liability to pay any fees or commissions to any broker, finder or agent or any other similar payment in connection with the transaction contemplated by this Agreement for which the Purchaser would be liable.

Section 3.10     Sales Taxes.  Seller has paid all sales Tax obligations due and owing prior to Closing and has reserved for payment of and Seller shall pay or cause to be paid all sales Tax obligations which shall become due after the Closing.  If the Seller shall fail to timely and fully pay all sales Tax obligations, it shall indemnify, defend and save harmless the Purchaser from all liabilities in connection therewith or related thereto.  The provisions of this section shall survive the Closing.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller that as of the date of this Agreement and as of the Closing Date the statements set forth in this Article 4 are true and correct in all respects:

Section 4.1    Organization and Good Standing.  The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Virginia.

Section 4.2    Authority and Enforceability.  The Purchaser has all requisite limited liability company power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is a party and to perform its obligations under this Agreement and each such Ancillary Agreement.  The execution, delivery and performance of this Agreement and each Ancillary Agreement to which the Purchaser is a party and the consummation of the transaction contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Purchaser. The Purchaser has duly and validly executed and delivered this Agreement and, on or prior to the Closing, the Purchaser will have duly and validly executed and delivered each Ancillary Agreement to which it is a party.  This Agreement constitutes, and upon execution and delivery each Ancillary Agreement to which the Purchaser is a party will constitute, the valid and binding obligation of the Purchaser, as applicable, enforceable against the Purchaser in accordance with its terms.

Section 4.3    No Conflict.  Neither the execution, delivery and performance by the Purchaser of this Agreement and each Ancillary Agreement to which the Purchaser is a party, nor the consummation by the Purchaser of the transaction contemplated hereby or thereby, will: (a) directly or indirectly (with or without notice, lapse of time or both), conflict with, result in a breach or violation of, constitute a default under, give rise to any right of revocation, withdrawal, suspension, acceleration, cancellation, termination, modification, imposition of additional obligations or loss of rights under, result in any payment becoming due under, or result in the imposition of any encumbrance on any of the properties or assets of the Purchaser under (i) the applicable charter or organizational documents of the Purchaser or any resolution adopted by the governing body of the Purchaser, (ii) any Contract to which the Purchaser is a party or by which the Purchaser is bound or to which any of its properties or assets is subject, except to the extent any such conflict, breach, violation, right or encumbrance would not materially affect the Purchaser's ability to consummate the transaction contemplated hereby, or (iii) any Law, Judgment or Governmental Authorization applicable to the Purchaser or any of its properties or assets; or (b) except for the Bankruptcy Court Approvals, require the Purchaser to obtain any other Consent or Governmental Authorization of, give any notice to, or make any filing or registration with, any Governmental Authority or other Person, except in any case that would not reasonably be expected to have, either individually or in the aggregate, a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement or on the ability of the Purchaser to consummate the transaction contemplated by this Agreement.

Section 4.4    Legal Proceedings.  Except as set forth in Section 5.3(b), there is no Proceeding pending or, to the Purchaser's knowledge, threatened, against the Purchaser that

challenges, or that would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, the transaction contemplated by this Agreement.

Section 4.5    Brokers or Finders.  Neither the Purchaser nor any Person acting on its behalf has incurred any Liability to pay any fees or commissions to any broker, finder or agent or any other similar payment in connection with the transaction contemplated by this Agreement for which the Seller would be liable.

Section 4.6    Available Funds.  The Purchaser has, and at the Closing will have, sufficient funds on hand to enable it to pay the Purchase Price in accordance with Section 2.5 and to otherwise consummate the transaction contemplated by this Agreement.  The availability of such funds is not contingent upon any third party financing application or agreement.  The Purchaser shall, within five (5) business days after the execution of this Agreement by the Parties hereto provide to the Seller reasonably satisfactory evidence of the availability of sufficient funds to consummate the transaction contemplated by this Agreement.  Such evidence may consist of a letter from the Purchaser's bank or accountant.

## ARTICLE 5
## PRE-CLOSING COVENANTS

Section 5.1    Access and Investigation.  Until the Closing and upon reasonable advance notice from the Purchaser: (a) the Seller will allow the Purchaser and its directors, officers, employees, agents, prospective financing sources, consultants and other advisors and representatives reasonable access during normal business hours to all documents, records, work papers and information with respect to all of the Purchased Assets as the Purchaser may reasonably request; (b) the Purchaser will be permitted, in its sole discretion and at its expense, to conduct inspections and tests on the Purchased Assets; and (c) the Seller will cooperate and will use commercially reasonable efforts to cause the Seller's accountants to cooperate with the Purchaser and its representatives in making available the financial information relating to the Purchased Assets and the Wells Fargo Lien.

Section 5.2    Use of the Purchased Assets.

(a)    Affirmative Covenants Concerning the Purchased Assets.  Until the Closing, except as expressly consented to by the Purchaser, in writing and in its sole discretion, the Seller shall:

(i)    preserve and protect the Purchased Assets;

(ii)    perform and comply in all respects with all of its obligations under the Wells Fargo Lien, as modified by any order of the Bankruptcy Court, and all other Contracts relating to or affecting the Purchased Assets or the Lease, and comply in all respects with all Laws, Judgments and Governmental Authorizations applicable to the Purchased Assets;

(iii) continue in full force and effect replacement cost insurance on the Purchased Assets, which insurance shall not be subject to any deductible or self-insured retention and which insurance shall comply in all respects to the requirements of the Wells Fargo Lien; and

(iv) maintain the books and records relating to the Purchased Assets.

(b) <u>Negative Covenants Concerning the Purchased Assets</u>. Until the Closing, except as expressly permitted by this Agreement or as otherwise expressly consented to by the Purchaser, in writing and in its sole discretion, the Seller will not:

(i) enter into any Contract for the sale, transfer or other conveyance of any of the Purchased Assets or the Lease;

(ii) dispose of any Purchased Assets or the Lease; or

(iii) agree, whether in writing or otherwise, to do any of the foregoing.

<u>Section 5.3</u>    <u>Consents and Filings; Reasonable Efforts</u>

(a) The Seller will use its commercially reasonable efforts (i) to take promptly, or cause to be taken (including actions after the Closing), all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transaction contemplated by this Agreement; (ii) as promptly as practicable after the date of this Agreement, with the reasonable cooperation of the Purchaser and at no cost or expense whatsoever to the Purchaser, to obtain all Governmental Authorizations from, give all notices to, and make all filings with, all Governmental Authorities, to obtain all other Consents from, and give all other notices to, all other Persons, in each case that are necessary in connection with the authorization, execution and delivery of this Agreement and the consummation of the transaction contemplated by this Agreement.

(b) <u>Bankruptcy Court Approvals</u>. The Seller and the Purchaser acknowledge that this Agreement, the sale of the Purchased Assets and the rejection by the Seller of the Lease are subject to Bankruptcy Court approvals (collectively, the "<u>Bankruptcy Court Approvals</u>") in that certain bankruptcy case entitled *In re Taylor Brothers, Incorporated*, Case No. 10-30216 pending in the Bankruptcy Court. The Seller and the Purchaser acknowledge that to obtain the Bankruptcy Court Approvals, the Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transaction contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court. As soon as reasonably possible after the execution hereof by the Parties hereto, the Seller shall file a sale motion with the Bankruptcy Court seeking approval of the sale of the Purchased Assets pursuant to 11 U.S.C. § 363 free and clear of all liens, claims and encumbrances, including the Wells Fargo Lien and seeking the ability to proceed to Closing immediately upon entry of an order approving such motion (the "<u>Sale Motion</u>"), together with required supporting papers and required notices, and shall take such actions as are necessary to request a prompt hearing to approve, as soon as practicable, the Sale Motion. In addition, the Seller shall file and prosecute on an identical time schedule a Motion to Reject the Lease, contingent upon obtaining the other Bankruptcy Court

Approvals of the Sale Motion and this Agreement and the occurrence of the Closing Date.  From and after the date hereof, the Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Motion, the rejection of the Lease or the release of the Wells Fargo Lien from the Purchased Assets and the Lease.

Section 5.4      Notification.

(a)      Until the Closing, the Seller will give prompt notice to the Purchaser of (i) the occurrence, or non-occurrence, of any event, the occurrence or non-occurrence of which would reasonably be expected to cause any representation or warranty of the Seller contained in this Agreement to be untrue or inaccurate in any material respect, in each case at any time from and after the date of this Agreement until the Closing, (ii) any failure to comply with or satisfy in any respect any covenant or agreement to be complied with or satisfied by the Seller under this Agreement, (iii) the failure of any condition precedent to the Purchaser's obligations under this Agreement, (iv) any communication from any Person alleging that the Consent of such Person is or may be required in connection with the consummation of the transaction contemplated by this Agreement, and (v) any notice or other communication from any Governmental Authority in connection with the consummation of the transaction contemplated by this Agreement.

(b)      Until the Closing, the Purchaser will give prompt notice to the Seller of (i) the occurrence, or non-occurrence, of any event, the occurrence or non-occurrence of which would reasonably be expected to cause any representation or warranty of the Purchaser contained in this Agreement to be untrue or inaccurate in any material respect, in each case at any time from and after the date of this Agreement until the Closing, (ii) any failure to comply with or satisfy in any respect any covenant or agreement to be complied with or satisfied by the Purchaser under this Agreement, (iii) the failure of any condition precedent to the Seller's obligations under this Agreement, (iv) any communication from any Person alleging that the Consent of such Person is or may be required in connection with the consummation of the transaction contemplated by this Agreement, and (v) any notice or other communication from any Governmental Authority in connection with the consummation of the transaction contemplated by this Agreement.

Section 5.5      Risk of Loss.  All risk of loss or destruction of or damage to the Purchased Assets prior to the Closing shall be borne by the Seller and all insurance proceeds payable as a result thereof shall be paid to the Seller.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

Section 6.1      Conditions to the Obligation of the Purchaser.  The obligation of the Purchaser to consummate the transaction contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part):

(a)      Accuracy of Representations and Warranties.  The  representations and warranties of the Seller in this Agreement must have been true and correct in all respects as of the date of this Agreement and must be true and correct in all respects as of the Closing Date;

(b) <u>Performance of Covenants</u>. All of the covenants and obligations that the Seller and Roper are required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all respects;

(c) <u>Consents</u>. Each of the Governmental Authorizations and Consents that is required to be obtained as a condition to Closing must have been obtained and must be in full force and effect;

(d) <u>Entry of Order by Bankruptcy Court</u>. Entry of an order or orders by the Bankruptcy Court effecting the Bankruptcy Court Approvals;

(e) <u>No Action</u>. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transaction contemplated by this Agreement; and

(f) <u>Transaction Documents</u>. The Seller must have delivered or caused to be delivered each document or other item that Section 2.6(a) requires the Seller to deliver.

<u>Section 6.2</u>    <u>Conditions to the Obligation of the Seller</u>. The obligation of the Seller to consummate the transaction contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a) <u>Accuracy of Representations and Warranties</u>. The representations and warranties of the Purchaser in this Agreement must have been true and correct in all respects as of the date of this Agreement and must be true and correct in all respects as of the Closing Date;

(b) <u>Performance of Covenants</u>. All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all respects;

(c) <u>No Action</u>. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transaction contemplated by this Agreement; and

(d) <u>Transaction Documents</u>. The Purchaser must have delivered or caused to be delivered to the Seller each document or other item that Section 2.6(b) requires it to deliver.

<u>Section 6.3</u>    <u>Break Up Fee</u>. The Seller acknowledges (a) that the Purchaser has made and will make a substantial investment in time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence with respect to the Purchased Assets, and its efforts to consummate the transaction contemplated hereby, and (b) that the Purchaser's efforts have substantially benefited the Seller and will benefit the bankruptcy estate of the Seller through the submission of the offer reflected in this Agreement, which will serve as a minimum bid on which other potentially interested bidders can rely. Therefore, as compensation for entering into this Agreement, taking action to consummate the transaction contemplated hereby and incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, the Seller agrees as follows, subject, however, to the Bankruptcy Court Approvals, to pay to the Purchaser upon the closing of any alternative transaction for the sale, transfer or conveyance of all or a portion of the

Purchased Assets or the Lease to any third party an amount equal to the sum of (the "Break-Up Fee"):  (i) $25,000, plus (ii) the actual out of pocket expenses of the Purchaser, not to exceed in the aggregate, the sum of $25,000.00, paid or payable to third parties, with respect to: (1) the Purchaser's due diligence in connection with the transaction contemplated by this Agreement; (2) the Purchaser's legal fees and expenses and the fees and expenses of all consultants and experts incurred in connection with the transaction contemplated by this Agreement; (3) the Purchaser's preparations for Closing; and (4) the Purchaser's internal costs and expenses incurred in connection with the transaction contemplated by this Agreement, including, but not limited to, the salaries and benefits of the Purchaser's employees working on such transaction and the Purchaser's overhead therefor.  The provisions of this Section 6.3 shall survive the termination of this Agreement.

## ARTICLE 7
## TERMINATION

Section 7.1    Termination Events.  This Agreement may, by written notice given before or at the Closing, be terminated:

(a)    by mutual consent of the Purchaser and the Seller, in which event the Escrow Agent shall pay the Deposit to the Purchaser and the Parties shall thereafter have no further Liabilities or obligations whatsoever under this Agreement, except as permitted in Section 7.2;

(b)    by the Purchaser (so long as the Purchaser is not then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement) if there has been a breach of any of the Seller's representations, warranties, covenants or agreements contained in this Agreement, which would result in the failure of a condition set forth in Section 6.1(a) or Section 6.1(b), and which breach has not been cured or cannot be cured within fifteen (15) days after the notice of the breach from the Purchaser, in which event the Escrow Agent shall pay the Deposit to the Purchaser and other than the payment of the Break Up Fee, if applicable, the Parties shall thereafter have no further Liabilities or obligations whatsoever under this Agreement except as permitted in Section 7.2;

(c)    by the Seller (so long as the Seller is not then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement) if there has been a breach of any of the Purchaser's representations, warranties, covenants or agreements contained in this Agreement, which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), and which breach has not been cured or cannot be cured within fifteen (15) days after the notice of breach from the Seller, in which event the Escrow Agent shall pay the Deposit to the Seller as liquidated damages, pursuant to Section 7.2 hereof, and the Parties shall thereafter have no further Liabilities or obligations whatsoever under this Agreement; or

(d)    by the Purchaser if the Closing has not occurred (other than through the failure of the Purchaser to comply fully with its obligations under this Agreement) on or before January 22, 2010, or such other later date established in accordance with Section 2.5.

Section 7.2    Payment of Deposit.  If the Purchaser breaches this Agreement and fails to close on the Closing Date, the Escrow Agent shall pay the Deposit to the Seller as liquidated

damages and as the Seller's sole remedy, the Seller and the Purchaser hereby acknowledging and agreeing that it would be very difficult or not possible to determine with precision the damages incurred by the Seller upon a default by the Purchaser, and that the Deposit represents a reasonable estimate of such damages.

## ARTICLE 8
## ADDITIONAL COVENANTS

Section 8.1     Tax Matters. If, prior to the Closing, there have been any personal property Taxes accrued or assessed against any of the Purchased Assets, the Seller shall, at the Closing, pay such Taxes either at Closing or through its chapter 11 case, whether such personal property Taxes are due and payable before or after the Closing, attributable to periods or partial periods ending on or prior to the Closing Date, and the Purchaser shall be responsible for paying any such personal property Taxes relating to the Purchased Assets attributable to periods or partial periods beginning after the Closing Date, with a daily allocation for any period that begins before the Closing Date and ends after the Closing Date.

## ARTICLE 9
## INDEMNIFICATION

Section 9.1     Indemnification by the Seller.  Subject to the limitations expressly set forth in this Article 9, the Seller indemnifies and holds harmless the Purchaser and its respective directors, officers, equity owners, employees, agents, consultants and other advisors and representatives (collectively, the "Purchaser Indemnified Parties") from and against any and all Losses incurred or suffered by the Purchaser Indemnified Parties to the extent directly or indirectly arising out of, relating to or resulting from any of the following:

(a)     any inaccuracy in or breach of any representation or warranty of the Seller contained in this Agreement or any Ancillary Agreement;

(b)     any nonfulfillment, nonperformance or other breach of any covenant or agreement of the Seller contained in this Agreement (including, but not limited to, the enforcement of this Section 9.1) or any Ancillary Agreement; and

(c)     any personal property Taxes relating to the Purchased Assets for which the Seller shall be liable, as set forth in Section 8.1.

For purposes of this Section 9.1, the amount of any Losses associated with any inaccuracy in, or breach of any representation or warranty or nonfulfillment, nonperformance or other breach of, any covenant or agreement by the Seller will be determined without regard for any materiality or similar qualification set forth in any such representation, warranty, covenant or agreement.

Section 9.2     Indemnification by the Purchaser.  Subject to the limitations expressly set forth this Article 9, the Purchaser will indemnify and hold harmless the Seller and  its respective

directors, officers, equity owners, employees, agents, consultants and other advisors and representatives (collectively, the "Seller Indemnified Parties") from and against any and all Losses incurred or suffered by the Seller Indemnified Parties to the extent directly or indirectly arising out of, relating to or resulting from any of the following:

(a)     any inaccuracy in or breach of any representation or warranty of the Purchaser contained in this Agreement or any Ancillary Agreement;

(b)     any nonfulfillment, nonperformance or other breach of any covenant or agreement of the Purchaser contained in this Agreement (including, but not limited to, the enforcement of this Section 9.2) or any Ancillary Agreement; and

(c)     any personal property Taxes relating to the Purchased Assets for which the Purchaser shall be liable, as set forth in Section 8.1.

For purposes of this Section 9.2, the amount of any Losses associated with any inaccuracy in, or breach of any representation or warranty or nonfulfillment, nonperformance or other breach of, any covenant or agreement by the Purchaser will be determined without regard for any materiality or similar qualification.

Section 9.3     Survival.  All representations and warranties contained in this Agreement and any Ancillary Agreement will survive the Closing, irrespective of any facts known to any indemnified Party at or prior to the Closing or any investigation at any time made by or on behalf of any indemnified Party, will survive Closing indefinitely.

# ARTICLE 10
# GENERAL PROVISIONS

Section 10.1     Notices.  All notices and other communications under this Agreement must be in writing and are deemed duly delivered when (a) delivered, if delivered personally or by nationally recognized overnight courier service (costs prepaid), (b) sent by facsimile with confirmation of transmission by the transmitting equipment (or, the first business day following such transmission if the date of transmission is not a business day) or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number or individual as a Party may designate by notice to the other Party):

If to the Seller:

Taylor Brothers, Incorporated
c/o John Kauzlarich
130 Pocahontas Street
Petersburg, VA 23803

with a copy (which will not constitute notice) to:

DurretteBradshaw PLC
600 E. Main Street, 20th Floor
Richmond, VA 23219
Attn: Roy M. Terry, Jr., Esq. or Elizabeth L. Gunn, Esq.


If to the Purchaser:

The Lester Group, Inc.
P.O. Drawer 4991
Martinsville, VA  24115
(OVERNIGHT ONLY:  101 East Commonwealth Boulevard, Martinsville, VA  24112)

with a copy (which will not constitute notice) to:

Troutman Sanders LLP
Troutman Sanders Building
1001 Haxall Point, 15th Floor
Richmond, VA 23219
Att:  Neil S. Kessler, Esquire

If to Escrow Agent:

DurretteBradshaw PLC
600 E. Main Street, 20th Floor
Richmond, VA 23219
Attn: Roy M. Terry, Jr., Esq. or Elizabeth L. Gunn, Esq.


    Section 10.2   Amendment.  This Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each Party to be bound by the amendment and that identifies itself as an amendment to this Agreement.

    Section 10.3   Waiver.  Each Party may (a) extend the time for performance of any of the obligations or other acts of any other Party to this Agreement, (b) waive any inaccuracies in the representations and warranties of any other Party to this Agreement contained in this Agreement, any Ancillary Agreement or in any certificate, instrument or document delivered pursuant to this Agreement or (c) waive compliance with any of the covenants, agreements or conditions for the benefit of such Party contained in this Agreement, any Ancillary Agreement or in any certificate, instrument or document delivered pursuant to this Agreement.  Any such extension or waiver by a Party to this Agreement will be valid only if set forth in a written document signed on behalf of the Party or Parties against whom the waiver or extension is to be effective.  No extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant, agreement or condition, as the case may be, other than that which is specified in the written extension or waiver.  No failure or delay by a Party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this

Agreement, and no course of dealing between the Parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy.

Section 10.4    Entire Agreement.  This Agreement (including any schedules and exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at the Closing) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements or representations by or between the Parties, written or oral, with respect to the subject matter of this Agreement.

Section 10.5    Assignment and Successors and No Third Party Rights.  This Agreement binds and benefits the Parties and their respective successors and assigns; provided, however, that the Seller may not assign this Agreement or any of its rights herein to any Person without the Purchaser's prior written consent, in its sole discretion.  No Party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation.  Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement except such rights as may inure to a successor or permitted assignee under this Section.

Section 10.6    Severability.  If the final Judgment of a court of competent jurisdiction declares that any provision of this Agreement is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement are not affected or impaired in any way and the Parties agree that the court making such determination will have the power to limit the provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable provision with a provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable provision, and this Agreement will be enforceable as so modified.  In the event such court does not exercise the power granted to it in the prior sentence, the Parties agree to negotiate in good faith to replace such invalid, illegal and unenforceable provision with a valid, legal and enforceable provision that achieves, to the greatest lawful extent under this Agreement, the economic, business and other purposes of such invalid, illegal or unenforceable provision.

Section 10.7    Exhibits and Schedules.  All exhibits and schedules to this Agreement are hereby incorporated herein by reference and made a part of this Agreement.

Section 10.8    Interpretation.  In the negotiation of this Agreement, each Party has received advice from its own attorney.  The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against any Party because that Party or its attorney drafted the provision.

Section 10.9    Governing Law.  Unless any exhibit or schedule specifies a different choice of law, the internal laws of the Commonwealth of Virginia shall govern all matters arising out of or relating to this Agreement and the transaction it contemplates, including its validity,

interpretation, construction, performance and enforcement and any disputes or controversies arising therefrom or related thereto.

Section 10.10 Specific Performance. The Parties agree that irreparable damage may occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. The Parties accordingly agree that, in addition to any other remedy to which they are entitled at law or in equity, the Parties are entitled to injunctive relief to prevent breaches of this Agreement and otherwise to enforce specifically the provisions of this Agreement. Each Party expressly waives any requirement that any other Party obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

Section 10.11 Jurisdiction and Service of Process. Any action or proceeding arising out of or relating to this Agreement or the transaction contemplated by this Agreement must be brought in the United States District Court or Bankruptcy Court for the Eastern District of Virginia, Richmond Division. Each of the Parties knowingly, voluntarily and irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding and waives any objection it may now or hereafter have to venue or to convenience of forum. Any Party to this Agreement may make service on another Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 10.1. Nothing in this Section 10.11, however, affects the right of any Party to serve legal process in any other manner permitted by law.

Section 10.12 Waiver of Jury Trial. EACH OF THE PARTIES KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR THE ACTIONS OF ANY PARTY TO THIS AGREEMENT IN NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT.

Section 10.13 Expenses. Except as otherwise expressly provided in this Agreement, each Party will pay its respective direct and indirect expenses incurred by it in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated by this Agreement, including all fees and expenses of its advisors and representatives. If this Agreement is terminated, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from any breach of this Agreement by the other Party.

Section 10.14 No Consequential Damages. Notwithstanding anything to the contrary in this Agreement, neither Party shall have any liability hereunder to the other Party, its respective indemnified Parties or to any other Person for any consequential or indirect damages, including, without limitation, loss of profit, loss of use or business stoppage.

Section 10.15 No Joint Venture. Nothing in this Agreement creates a joint venture or partnership between the Parties. This Agreement does not authorize any Party (a) to bind or

commit, or to act as an agent, employee or legal representative of, the other Party, except as may be specifically set forth in other provisions of this Agreement or (b) to have the power to control the activities and operations of the other Party. The Parties are independent contractors with respect to each other under this Agreement. Each Party agrees not to hold itself out as having any authority or relationship contrary to this Section 10.15.

Section 10.16 Counterparts. The Parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the Party that signed it, and all of which together constitute one agreement. This Agreement is effective upon delivery of one executed counterpart from each Party to the other Party. The signatures of all Parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

[*Signature page follows.*]

The Parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

THE LESTER GROUP, INC.,
a Virginia corporation,
as Purchaser

By: _____
Name: M. Dillard Jones
Title: President

TAYLOR BROTHERS,
INCORPORATED, a Virginia corporation,
as Seller

By: _____
Name: J. Philip Taylor III
Title: Chairman

The undersigned Escrow Agent hereby agrees to hold, invest and disburse the Deposit in accordance with the terms and provisions of the foregoing Agreement.

DURRETTE BRADSHAW PLC

By: _____
Name: _____
Title: _____

23

All inventory held by the Seller for re-sale and located at 905 Graves Mill Road, Lynchburg, Virginia, as set forth in Schedule 2.1(a) to be attached hereto as a part hereof following the hereinafter described inspections by the Purchaser, expressly excluding all "slow-moving inventory" and "special order" items, all as reasonably determined by the Purchaser following its inspections, immediately prior to the Closing, of the inventory and the documentation relating thereto evidencing the Seller's cost therefor.

Exhibit 2.1(a)

Exhibit 2.1(b) to Asset Purchase Agreement by and between
<u>The Lester Group, Inc. and Roper Brothers Lumber Company, Incorporated</u>

     All fixed assets located at 905 Graves Mill Road, Lynchburg, to be determined and identified by an inspection and review by the Purchaser immediately prior to the Closing, including, but not limited to, the assets described on Schedule 2.1(b) attached hereto as a part hereof, to the extent the same are then located at 905 Graves Mill Road.

Exhibit 2.1(b) – Page 0

Taylor Brothers
Fixed Asset Listing

| | In Service | Cost | Accum Depr | NBV |
|---|---|---|---|---|
| **Bedford** | | | | |
| 262 Dell | 2006 | 2,063 | 2,063 | 0 |
| 268 Thin Client | 2006 | 4,024 | 4,024 | 0 |
| 271 Dell | 2006 | 1,546 | 1,546 | 0 |
| | | 7,633 | 7,633 | 0 |
| | | | | |
| 41 Fixture-Racks | 2007 | 27,473 | 8,504 | 18,969 |
| 290 Racking | 2007 | 41,711 | 20,856 | 20,855 |
| | | 69,184 | 29,360 | 39,824 |
| | | | | |
| 1 Knapheide 16' Platform | 1996 | 5,212 | 5,212 | 0 |
| 2 20 ' Van Body for #17 | 1996 | 6,505 | 6,505 | 0 |
| 4 Goodwin 22 Truck Body w lift kit | 1998 | 6,530 | 6,530 | 0 |
| 5 Teledyne Piggyback lift truck | 1999 | 38,561 | 38,561 | 0 |
| 6 2000 Ford F150 Pickup #21 | 1999 | 16,503 | 16,503 | 0 |
| 7 2000 International 4900 #105 | 1999 | 63,784 | 63,784 | 0 |
| 9 Teledyne Princeton Piggyback lift truck | 2000 | 34,172 | 34,172 | 0 |
| 10 Godwin 24 Body for #5 | 2000 | 4,774 | 4,774 | 0 |
| 11 2001 Ford F150 #103 | 2000 | 19,052 | 19,052 | 0 |
| 12 Teledyne 050 Piggyback Lift | 2001 | 32,700 | 32,700 | 0 |
| 13 14' Flatbet Tag Trailer | 2001 | 3,950 | 3,950 | 0 |
| 15 Van Body for #2 | 2001 | 5,795 | 5,795 | 0 |
| 16 1991 Utility Trailer w tow motor | 2002 | 7,340 | 7,340 | 0 |
| 17 Golf Cart | 2002 | 2,613 | 2,613 | 0 |
| 18 Sterling LT 9513 Boom Truck | 2003 | 132,440 | 132,440 | 0 |
| 19 2000 Sterling Van Truck L7501 | 2003 | 35,690 | 35,095 | 595 |
| 20 Van Body for 2000 Sterling 22 | 2003 | 10,463 | 10,463 | 0 |
| 21 2003 Sterling Truck Lt 9513 | 2003 | 140,690 | 140,690 | 0 |
| 22 Teledyne Fork Truck D-50 | 2002 | 25,603 | 25,603 | 0 |
| 23 2004 Mack Tractor | 2003 | 72,000 | 72,000 | 0 |
| 24 19XX Great Dane Flat Bed Trailer | 2004 | 5,350 | 5,350 | 0 |
| 26 2003 Freightliner M-2 | 2003 | 32,157 | 32,157 | 0 |
| 27 2004 Chev Pick Up | 2004 | 15,451 | 15,451 | 0 |
| 28 2004 Sterling Truck | 2004 | 129,500 | 129,500 | 0 |
| 29 2001 International 4700 #2 | 2003 | 28,319 | 28,319 | 0 |
| 30 2004 Chev Silverado PU | 2004 | 15,644 | 15,383 | 261 |
| 31 Fass Boom on Truck #27 | 2004 | 70,800 | 68,440 | 2,360 |
| 32 2005 Sterling Lt9513 Truck #27 | 2004 | 52,532 | 50,762 | 1,770 |
| 33 2005 Chev Silverado PU #28 | 2004 | 18,094 | 17,190 | 904 |
| 34 2005 Chev Silverado PU #29 | 2005 | 15,225 | 13,702 | 1,523 |
| 35 2005 Sterling Lt9513 with Crane | 2005 | 160,970 | 123,410 | 37,560 |
| 36 2006 Mack DM59OS #3 | 2006 | 71,246 | 51,060 | 20,186 |
| 37 2005 International 4200 #13 | 2006 | 24,951 | 17,050 | 7,901 |
| 38 2006 Mack DM59OS #4 | 2006 | 87,746 | 59,960 | 27,786 |
| 39 2001 GMC Box Van | 2006 | 12,360 | 8,034 | 4,326 |

| | | | | |
|---|---|---|---|---|
| 40 Body for Truck #4 (Tidewater Mack) | 2006 | 8,748 | 5,686 | 3,062 |
| 174 2004 Mack Tractor - New Engine #314 | 2009 | 26,292 | 9,202 | 17,090 |
| | | 1,439,762 | 1,314,438 | 125,324 |
| | | | | |
| 57 Lunchroom Lockers | 1972 | 569 | 569 | 0 |
| 58 Rip Fence for Saw | 1976 | 373 | 373 | 0 |
| 59 Dust Collector | 1976 | 1,800 | 1,800 | 0 |
| 60 Rockwell Wood Shaper | 1980 | 1,293 | 1,293 | 0 |
| 61 Lumber Racks | 1985 | 14,559 | 14,559 | 0 |
| 62 Egr Safety Ladder | 1985 | 550 | 550 | 0 |
| 63 Snader Mill Shop | 1985 | 436 | 436 | 0 |
| 64 Air Compressor | 1985 | 2,066 | 2,066 | 0 |
| 65 Dust Removal Sys Mill Shop | 1985 | 27,390 | 27,390 | 0 |
| 66 Straight Line Rip Saw | 1985 | 5,000 | 5,000 | 0 |
| 67 TS MD 137 1HD Sander | 1985 | 12,950 | 12,950 | 0 |
| 68 Machine wiring mill shop | 1985 | 588 | 588 | 0 |
| 69 Powermatic MD 72 TA Saw | 1986 | 3,718 | 3,718 | 0 |
| 70 Powermatic MD 180 Loaner | 2006 | 4,830 | 4,830 | 0 |
| 71 Blowp PE for Planer | 1985 | 764 | 764 | 0 |
| 72 Powermatic 24 Jseo Planer | 1987 | 1,171 | 1,171 | 0 |
| 73 12" Radial Arm Saw | 1987 | 863 | 863 | 0 |
| 74 Riter R 60C Edge Used Sand | 1987 | 675 | 675 | 0 |
| 75 Four Roll 200V Feed | 1987 | 1,060 | 1,060 | 0 |
| 76 Snaco MDI 4V 3 Roll Feeder | 1987 | 699 | 699 | 0 |
| 77 Pnuematic Hinge Machine | 1987 | 2,000 | 2,000 | 0 |
| 78 Delta 28-28314 Band Saw | 1988 | 599 | 599 | 0 |
| 79 Chain Mortiser | 1988 | 2,375 | 2,375 | 0 |
| 80 Air Compressor | 1988 | 718 | 718 | 0 |
| 81 Air Compressor | 1988 | 1,154 | 1,154 | 0 |
| 82 Powermatic Saw | 1989 | 1,666 | 1,666 | 0 |
| 83 Profile Grinder | 1989 | 10,427 | 10,427 | 0 |
| 84 Crown Stock Picker | 1989 | 16,453 | 16,453 | 0 |
| 85 Warehouse Racks | 1989 | 19,598 | 19,598 | 0 |
| 86 Moulder | 1989 | 39,542 | 39,542 | 0 |
| 87 Rewire and ventilate Mill for Eq | 1989 | 12,656 | 12,656 | 0 |
| 88 Magnetic Road sweeper | 1989 | 907 | 907 | 0 |
| 89 Table Top Laminate Splitter | 1990 | 1,553 | 1,553 | 0 |
| 90 Line borer model 125-946 | 1991 | 6,500 | 6,500 | 0 |
| 91 15 Radios base unit | 1991 | 7,812 | 7,812 | 0 |
| 92 Two standard tilt trucks | 1994 | 742 | 742 | 0 |
| 93 Caterpillar Gp33 LPG Lifts | 1994 | 23,016 | 23,016 | 0 |
| 94 Three patton Blower fans | 1994 | 1,170 | 1,170 | 0 |
| 95 Band saw 36' SCMI Model | 1995 | 6,096 | 6,096 | 0 |
| 96 1996 Nissan Forklift P6CK 9 | 1996 | 20,997 | 20,997 | 0 |
| 97 Air Compressor Door shop | 1997 | 1,801 | 1,801 | 0 |
| 98 Air lines for door shop machine | 1997 | 2,166 | 2,166 | 0 |
| 99 dock seals for bays & door | 1997 | 3,232 | 3,232 | 0 |
| 100 Panle saw Scmi Hydor 320 | 1997 | 12,990 | 12,990 | 0 |
| 101 Krauter Rack System | 1998 | 35,968 | 35,968 | 0 |
| 102 Roura self dumping hopper | 1998 | 1,237 | 1,237 | 0 |

| | | | | |
|---|---|---|---|---|
| 103 14" radial arm saw - yard | 1999 | 1,711 | 1,711 | 0 |
| 104 Nissan P80Y Forklift | 1998 | 30,279 | 30,279 | 0 |
| 106 Ticting Multi Moulder | 1999 | 13,575 | 13,575 | 0 |
| 107 T Shed for Lumber Storage | 1999 | 46,439 | 46,439 | 0 |
| 108 Toyota Forklift | 2000 | 28,718 | 28,718 | 0 |
| 109 2001 Komatsu Forklift | 2001 | 20,419 | 20,419 | 0 |
| 110 T Shed - Bedford | 2001 | 41,787 | 23,680 | 18,107 |
| 111 Strike Jamb Machine Door Shop | 2001 | 4,901 | 4,901 | 0 |
| 113 Daewoo 6405 Fork Truck | 2002 | 28,215 | 28,215 | 0 |
| 114 Radial Arm Saw 12" | 2002 | 1,395 | 1,378 | 17 |
| 115 Wise 1525 Hinge Jamb Machine Door | 2001 | 4,028 | 4,028 | 0 |
| 117 DTI Screwfeed Gun Door | 2001 | 7,245 | 7,245 | 0 |
| 118 Snow Blade 10' | 2002 | 5,117 | 5,117 | 0 |
| 119 Catlever Rack | 2003 | 5,617 | 5,617 | 0 |
| 120 Brandt Edgebander | 2003 | 37,829 | 37,829 | 0 |
| 121 Porter Cable Router | 2003 | 2,550 | 2,550 | 0 |
| 122 Yale Forktruck | 2003 | 37,520 | 37,520 | 0 |
| 127 2005 Princeton EZ-3 RVX Trailer | 2005 | 49,611 | 30,121 | 19,490 |
| 128 Ruvo 808 Spl Duplex Trim Saw | 2005 | 15,540 | 9,065 | 6,475 |
| 129 Stemplate Photo System | 2005 | 13,120 | 10,496 | 2,624 |
| 130 Hyster Lift H100Xm | 2005 | 45,618 | 25,525 | 20,093 |
| 131 Hyster Lift H100Xm | 2005 | 45,618 | 25,525 | 20,093 |
| 132 2006 Princeton Lift P350 | 2006 | 39,900 | 19,475 | 20,425 |
| 133 Invicta Model Ti34 V05 Shaper | 2005 | 5,120 | 2,377 | 2,743 |
| 134 4 Roll 8 Speed feeder for shaper | 2006 | 1,069 | 496 | 573 |
| 135 Order Picker | 2006 | 4,410 | 2,048 | 2,362 |
| 257 Lightyear PRI Equipment | 2006 | 1,675 | 1,156 | 519 |
| 261 Dell Computer (Glenn) | 2006 | 3,452 | 3,452 | 0 |
| 263 Dell & CDW (Server) | 2006 | 10,270 | 9,985 | 285 |
| 264 CDW Plotter | 2006 | 20,960 | 20,377 | 583 |
| 265 CDW Thin Clients | 2006 | 12,073 | 12,073 | 0 |
| 267 CDW Printers | 2006 | 5,016 | 5,016 | 0 |
| 272 Dell Computer | 2006 | 989 | 989 | 0 |
| 273 Dell Computer | 2006 | 989 | 989 | 0 |
| 274 Dell Computer | 2006 | 1,885 | 1,885 | 0 |
| 275 Dell Computer | 2006 | 1,546 | 1,546 | 0 |
| 276 Dell Computer | 2006 | 1,546 | 1,546 | 0 |
| 277 Dell Computer | 2006 | 1,546 | 1,546 | 0 |
| 278 Dell Computer | 2006 | 1,546 | 1,546 | 0 |
| 279 Dell Computer | 2006 | 1,546 | 1,546 | 0 |
| 280 Dell Computer | 2006 | 1,546 | 1,546 | 0 |
| 281 Dell Computer | 2006 | 1,273 | 1,273 | 0 |
| 282 Dell Computer | 2006 | 1,273 | 1,273 | 0 |
| 283 Dell Computer | 2006 | 1,989 | 1,989 | 0 |
| 284 Stiles Machinery 12mm cutter | 2007 | 3,048 | 1,676 | 1,372 |
| 285 Dell Computer | 2007 | 2,189 | 2,189 | 0 |
| 288 CDW Scanner | 2007 | 990 | 990 | 0 |
| | | 929,427 | 813,666 | 115,761 |
| | | | | |
| 136 2 drawer file cabinet | 1984 | 193 | 193 | 0 |
| 137 Carpet | 1985 | 5,676 | 5,676 | 0 |

| | | | | |
|---|---|---|---|---|
| 138 Drapes | 1985 | 980 | 980 | 0 |
| 139 Drapes | 1985 | 663 | 663 | 0 |
| 140 Bathroom accessories | 1985 | 555 | 555 | 0 |
| 141 2 chairs | 1985 | 672 | 672 | 0 |
| 142 Architectural est & billing software | 2007 | 40,688 | 25,995 | 14,693 |
| 143 Lamps | 1985 | 229 | 229 | 0 |
| 144 Exterior Sign | 1985 | 290 | 290 | 0 |
| 145 Refrigerator | 1985 | 497 | 497 | 0 |
| 146 Steel File Cabinet | 1985 | 471 | 471 | 0 |
| 147 Haskell File Cabinet | 1985 | 167 | 167 | 0 |
| 148 Desk | 1985 | 637 | 637 | 0 |
| 149 Advertising Cabinet | 1987 | 750 | 750 | 0 |
| 150 Layout top kitchen dept | 1987 | 525 | 525 | 0 |
| 151 Security office addition | 1987 | 305 | 305 | 0 |
| 152 4 drawer lateral file | 1987 | 578 | 578 | 0 |
| 153 5 drawer file | 1987 | 370 | 370 | 0 |
| 154 Executive desk | 1988 | 946 | 946 | 0 |
| 155 Executive chair | 1988 | 509 | 509 | 0 |
| 156 Built in table bookkeeping | 1992 | 1,081 | 1,081 | 0 |
| 157 Impulse sale sing maker | 1992 | 2,734 | 2,734 | 0 |
| 158 Countertops | 1993 | 1,648 | 1,648 | 0 |
| 159 Acc Chair ergonomic | 1993 | 292 | 292 | 0 |
| 160 Merlin Legend Phone System | 1993 | 26,935 | 26,935 | 0 |
| 161 File Cabinet | 1994 | 507 | 507 | 0 |
| 162 Remote location software | 1995 | 7,838 | 7,838 | 0 |
| 163 Okidata Fax | 1995 | 1,249 | 1,249 | 0 |
| 164 Ithaca | 1996 | 2,087 | 2,087 | 0 |
| 165 Tape Drive | 1996 | 5,769 | 5,769 | 0 |
| 166 Housing for unit | 1996 | 630 | 630 | 0 |
| 167 Ids Security System | 1997 | 3,869 | 3,869 | 0 |
| 172 Pc | 1999 | 1,444 | 1,444 | 0 |
| 178 Okidata 395 Pin Printer | 1999 | 1,144 | 1,144 | 0 |
| 183 Computer 500 MHZ | 2000 | 44,446 | 44,446 | 0 |
| 184 Computer 2300 500 MHZ | 2000 | 11,815 | 11,815 | 0 |
| 185 Document mgmt software | 2000 | 19,775 | 19,775 | 0 |
| 186 Scanning software | 2000 | 9,334 | 9,334 | 0 |
| 187 Fujitsu Scanner | 2000 | 5,745 | 5,745 | 0 |
| 188 Hp Laserjet Printer | 2000 | 3,563 | 3,563 | 0 |
| 189 500 MHZ Computer | 2000 | 4,523 | 4,523 | 0 |
| 190 Installation of computer system | 2000 | 3,427 | 3,427 | 0 |
| 191 Electric modification for computer | 2000 | 1,814 | 1,814 | 0 |
| 192 Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 200 Power supply | 2000 | 729 | 729 | 0 |
| 201 Power supply | 2000 | 1,491 | 1,491 | 0 |
| 203 HP Designer Printer | 2000 | 1,568 | 1,568 | 0 |
| 204 Xerox Copier | 2000 | 8,417 | 8,417 | 0 |
| 205 Dell Penti Pc | 2000 | 1,110 | 1,110 | 0 |
| 212 HP Office Jet Printer Combo | 2000 | 218 | 218 | 0 |
| 213 Autocad software | 2000 | 577 | 577 | 0 |
| 214 HP Office Jet Printer Combo | 2000 | 218 | 218 | 0 |
| 215 Digital Surveilence System | 2001 | 7,420 | 7,420 | 0 |

| | | | | |
|---|---|---|---|---|
| 216 | Dell PC & Monitor | 2001 | 1,393 | 1,393 | 0 |
| 217 | Dell PC & Monitor | 2001 | 1,393 | 1,393 | 0 |
| 218 | Xerox Copier | 2002 | 7,190 | 7,190 | 0 |
| 219 | 20/20 Software | 2002 | 3,136 | 3,136 | 0 |
| 220 | Magix Telephone Software Upgrade | 2002 | 14,380 | 14,208 | 172 |
| 221 | 20/20 Software | 2003 | 2,131 | 2,131 | 0 |
| 222 | Laptop Computer | 2003 | 1,933 | 1,933 | 0 |
| 223 | Laptop Computer | 2003 | 1,858 | 1,858 | 0 |
| 224 | Kitchen & bath software | 2004 | 2,773 | 2,773 | 0 |
| 225 | Copeier Bedford | 2004 | 5,219 | 5,219 | 0 |
| 226 | Computer Server | 2004 | 13,150 | 13,150 | 0 |
| 229 | Security Camera System | 2005 | 13,076 | 7,005 | 6,071 |
| 230 | Panasonic Scanner | 2005 | 5,555 | 4,267 | 1,288 |
| 232 | HP Pavillion Computer | 2006 | 2,252 | 1,464 | 788 |
| 233 | PC For kitchen & bath | 2006 | 1,549 | 1,006 | 543 |
| 237 | Okidata Turbo Printer | 1999 | 608 | 608 | 0 |
| 238 | Okidata 24 Pin Printer | 1999 | 1,144 | 1,144 | 0 |
| 239 | Okidata 24 Pin Printer | 1999 | 1,144 | 1,144 | 0 |
| 240 | Okidata 24 Pin Printer | 1999 | 1,144 | 1,144 | 0 |
| 241 | Okidata 24 Pin Printer | 1999 | 1,144 | 1,144 | 0 |
| 242 | Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 243 | Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 244 | Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 245 | Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 246 | Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 247 | Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 248 | Gateway pentium | 2000 | 1,340 | 1,340 | 0 |
| 249 | Dell Pentium | 2000 | 1,110 | 1,110 | 0 |
| 250 | Dell Pentium | 2000 | 1,110 | 1,110 | 0 |
| 251 | Dell Pentium | 2000 | 1,110 | 1,110 | 0 |
| 252 | Dell Pentium | 2000 | 1,110 | 1,110 | 0 |
| 253 | Dell Pentium | 2000 | 1,110 | 1,110 | 0 |
| 254 | Dell Pentium | 2000 | 1,110 | 1,110 | 0 |
| 256 | 3 chairs | 1985 | 202 | 202 | 0 |
| 258 | Laptop Computer | 2006 | 1,400 | 1,400 | 0 |
| 259 | Telephone System | 2006 | 11,063 | 6,822 | 4,241 |
| 289 | Dell Computer | 2007 | 1,577 | 1,577 | 0 |
| 291 | Dell Computer | 2007 | 1,557 | 1,557 | 0 |
| | | | 354,469 | 326,673 | 27,796 |
| | | | | | |
| 42 | Showroom Overhead Lights | 1985 | 9,238 | 9,238 | 0 |
| 43 | Showroom gondolas | 1989 | 1,971 | 1,971 | 0 |
| 44 | Baldwin Hardware display | 1992 | 3,600 | 3,600 | 0 |
| 45 | Nuts & Bolts display | 1992 | 482 | 482 | 0 |
| 46 | Nuts & Bolts Bin | 1995 | 989 | 989 | 0 |
| 47 | Display rack extensions | 1992 | 1,646 | 1,646 | 0 |
| 48 | 14 4 ft gondola extenders | 1994 | 693 | 693 | 0 |
| 49 | Architectural Gallery Displays | 1997 | 2,038 | 2,038 | 0 |
| 54 | Retail Counter | 2003 | 13,378 | 8,361 | 5,017 |
| 175 | Anderson Window Display | 2008 | 18,626 | 6,209 | 12,417 |
| 176 | Pavement of lower yard | 2008 | 12,000 | 3,000 | 9,000 |

| | | | | |
|---|---|---|---|---|
| 255 Showroom gondolas | 1985 | 30,830 | 30,830 | 0 |
| 260 Kitchen/Bathroom Displays | 2006 | 84,115 | 53,274 | 30,841 |
| 292 High Bay Fixture Lighting | 2007 | 13,125 | 5,906 | 7,219 |
| | | 192,731 | 128,237 | 64,494 |
| Amortized Software | Misc | 11,384 | 11,384 | 0 |
| Totals per My Schedule | | 3,004,590 | 2,631,391 | 373,199 |
| Totals per Balance Sheet | | 3,004,767 | 2,649,947 | 354,820 |
| Immaterial Difference | | (177) | (18,556) | (18,733) |

(1) The difference in NBV is the depreciation for the month of October 2009 of $18,571.